Filed 9/9/20  P. v. Smith CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B290425 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA141321) |
| v. | |
| JUSTIN SMITH et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Patrick Connolly, Judge.  Convictions affirmed; remanded for resentencing.

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant Justin Glen Smith.

Marta I. Stanton, under appointment by the Court of Appeal, for Defendant and Appellant Kobe Kincherlow.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant

Attorney General, Paul M. Roadarmel, Jr. and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Justin Glen Smith and Kobe Kincherlow appeal from judgments entered after a jury convicted them each of crimes arising from their participation in a scheme to extort money from a recycling center in south Los Angeles and found true related weapon and criminal street gang enhancements. We affirm the convictions and remand the matters for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Amended Information*

Smith and Kincherlow were charged with one count of conspiracy to commit extortion (Pen. Code, § 182, subd. (a)(1))[1] (count 1); one count of second degree robbery (§ 211) (count 4); one count of assault with an assault weapon (§ 245, subd. (a)(3)) (count 6); one count of assault with a semiautomatic firearm (§ 245, subd. (b)) (count seven); and one count of extortion (§ 520) (count 17). Smith and Kincherlow were also charged with one count each of possession of a firearm by a felon (§ 29800, subd. (a)(1)) (count 8, Kincherlow) (count 16, Smith).

As to counts 1, 4, 6, 7 and 17, it was alleged the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). It was further alleged as to counts 1, 4 and 17 that a principal was armed with a

_____

[1] Statutory references are to this code.

firearm (§ 12022, subd. (a)(1)) and as to count 4 that a principal had personally used a firearm (§ 12022.53, subds. (b), (e)(1)).

Kincherlow was alleged to have suffered three prior convictions for serious or violent felonies within the meaning of the three strikes law (§§ 667, subds. (b)-(i), 1170.12), and three serious felony convictions arising out of the same case under section 667, subdivision (a), and had served five prior prison terms (§ 667.5, subd. (b)). As to Smith, the information alleged he had suffered one prior serious or violent felony conviction under the three strikes law and had served one prior prison term.

2. *Trial Testimony*

The East Coast Crips is a large criminal street gang with approximately 1,000 members in Los Angeles. Its primary activities include vandalism, theft, narcotics sales, weapons possession, burglaries, robberies, assaults with firearms, attempted murder and murder. Smith and Kincherlow belonged to the Quetorius 102 subset of the East Coast Crips (Q102's), whose territory ranged at the time of trial from 103rd Street to the south, 99th Street or Century Boulevard to the north, Stanford or McKinley Avenues to the east and Wall or Main Streets to the west. Smith was known as "Baby Hitman," and Kincherlow was known as "Sleep." Smith's older brother, Daivon Lewis, known as "Little Hitman," was tried with Smith and Kincherlow and was also convicted of multiple crimes related to the Q102's plan to extort, or "tax,"[2] businesses along South Main Street.[3]

---

[2] According to the People's gang expert, the term "taxing" meant extortion. Gang members require individuals to pay money to conduct business in the neighborhood without

3

In July 2016 Smith, Kincherlow, Lewis and several of their fellow gang members developed a plan to tax the business next to Eco Recycling on South Main Street. Chanel Grant, who testified for the People pursuant to a negotiated plea agreement, had seen people moving equipment for growing marijuana into the building. When Grant knocked on the door and asked what was going on, a man threatened her with a gun and told her to mind her own business. Grant told Smith, Kincherlow and Lewis about the incident, and they accompanied her to the grow house. The man who had threatened Grant was not there; but the gang members learned the grow house was owned by the brother-in-law of Hector Sanchez, the owner of the business next door, Eco Recycling. Sanchez offered to set up a meeting with his brother-in-law.

When Sanchez failed to set up the meeting with the owner of the grow house, the gang members directly approached him. Kincherlow told him an agreement would have to be reached for pulling a gun on Grant. Kincherlow and Lewis reported to the other gang members the owner had agreed to pay five pounds of marijuana and $10,000 per month to compensate the gang and to continue to operate in the neighborhood. Sanchez would handle the agreement on behalf of the owner.

Sanchez again delayed, telling Kincherlow and Lewis he did not have the money. Eventually he provided Kincherlow with some money and marijuana on behalf of the grow house, which was shared among the gang members. The amount of money and

interference from the gang. Sometimes, the gang also offers protection in exchange for the money.

[3] Lewis has separately appealed his convictions. (See *People v. Lewis* (Sept. 9, 2020, B296286) [nonpub. opn.].)

4

marijuana was less than the amount agreed upon, however, so Kincherlow returned to Eco Recycling. Sanchez again put him off. The gang members concluded Sanchez was taking a cut of the amount they were to be paid and decided he would have to pay what was still owed or face retaliation. Although Grant did not accompany Kincherlow, Lewis and Smith when they again visited Sanchez at Eco Recycling, they told her when they returned that Smith had taken two guns, including an AR-15 assault weapon, from Sanchez. They did not tell Grant they had taken cash from Sanchez.

When Sanchez testified, he denied any knowledge of a grow house next door. He had been approached in June 2016 by Kincherlow, Smith, Lewis and Grant, who claimed she had been threatened at gunpoint at the business next door. Kincherlow told Sanchez he represented all Crips and, if Sanchez wanted to stay in business, he would have to pay money. Sanchez denied anyone associated with his business had pointed a gun at Grant but agreed to talk to Kincherlow and Lewis the next day. The next day Kincherlow and Lewis demanded $2,000 for the incident with Grant and monthly payments of the same amount to operate his recycling business. After that conversation Sanchez purchased and installed security cameras outside the Eco Recycling office.

Throughout the rest of June Sanchez resisted Kincherlow and Lewis's requests for money by inviting them to smoke and drink with him but claiming he had not received money from his brother-in-law. He testified he was afraid of the gang and used a friendly demeanor to defuse the situation. Sometime in July Kincherlow and Lewis told Sanchez he owed money for June and July, as well as penalties, and demanded he pay $10,000.

On July 27, 2016, after having been rebuffed multiple times, Kincherlow and Lewis entered the Eco Recycling office and demanded money. Sanchez, feeling threatened, did not resist when Lewis took approximately $7,100 from a desk drawer, put it in a bag and left.[4] Half an hour later, Lewis returned, accompanied by Smith and another gang member, James Thompson, and demanded another $3,000. Kincherlow followed a few minutes later. Smith had a pistol, and Thompson had an assault rifle he held down at his side. Smith threatened Sanchez and pointed his pistol at Sanchez's employee, Deandrey Perry. Thompson stood behind Smith, blocking the door. Smith began opening drawers and took a .40 caliber gun that belonged to Sanchez. Kincherlow told Smith to calm down and not to take the gun, but Smith refused to give it back. Kincherlow, Lewis and Thompson left the office, but Smith continued to make threats and told Sanchez he would need to pay $3,100 to get his gun back. As Smith walked out of the office, he stumbled, turned around and pointed two guns at the office doorway before leaving.[5] Sanchez believed Smith was waiting to shoot them if they left the office.

---

[4]     Los Angeles Police Detective Christian Mrakich testified Sanchez had told him two men searched his office and took the money from a cashbox on his desk.

[5]     Perry testified he had been counting money when Kincherlow and Lewis first entered the Eco Recycling office. Although he did not see them take the money, he later noticed it was gone. When Smith entered, he had his hand in his pocket as though he was carrying a gun. Thompson stood with a stiff leg as if he had something large in his pants. Later, Smith had a gun in his hand as he threatened Sanchez and Perry and said he could kill both of them if he wanted. After the gang members left,

6

Sanchez closed the recycling center after the incident. He eventually reported the crime to the police and provided the video surveillance footage, which was played for the jury. The video showed, when entering the office, Smith had his hands in his pockets as if he was concealing a weapon; and Thompson walked stiffly. After leaving, Smith withdrew two semiautomatic handguns from his pockets and aimed them at the door; Thompson held an automatic rifle, which he then thrust down his pant leg.

Los Angeles Police Detective Christian Mrakich testified Lewis, Kincherlow, Smith and Thompson had been identified in the video by local officers familiar with the Q102's and arrested. Mrakich, who explained his investigation corroborated Grant's testimony, also stated Grant told him she had stolen a stainless steel .44 caliber revolver in a house burglary, which she then sold to Kincherlow. A stainless steel .44 caliber revolver was later recovered from an unlocked storage shed associated with Kincherlow's apartment.[6]

Lewis was the only defendant to testify about the Eco Recycling shakedown. Lewis admitted he, Smith and Kincherlow were members of the East Coast Crips Q102's. According to Lewis, after Grant told him someone at the grow shop had pulled

_____

Perry saw Smith on the live video feed pointing his weapons at him and Sanchez through the door.

[6]     The revolver was found in a black backpack along with ammunition, a black ski mask, handcuffs, plastic gloves and a box of condoms. The same brand of condoms was found in Kincherlow's wallet when he was arrested. The revolver's serial number matched the serial number of the weapon reported stolen in the burglary described by Grant.

a gun on her, he and Kincherlow accompanied her to speak with the owner of the shop. The owner told them to step around to speak with his business partner (Sanchez) at Eco Recycling. The grow shop owner explained the situation to Sanchez, who invited Lewis and Kincherlow to come back the next day to discuss amends. According to Lewis, no threats were made; and the tone of the conversation was civil. The next day Sanchez told them the security guard who had threatened Grant would be fired and Sanchez and his business partner would sell them marijuana at a cheap price. Soon after, Sanchez, who was friendly to them, shared samples of the marijuana as they smoked and drank at the Eco Recycling office. Lewis bought marijuana from Sanchez multiple times and sold it to his clients. He arranged to buy a pound of marijuana for Smith and paid Sanchez $1,600 in advance. Lewis and Kincherlow received the marijuana from Sanchez; but, when Smith examined it, he told Lewis the amount was short.

Lewis returned to the Eco Recycling office. Perry was sitting near the door with a gun on his lap. Sanchez had a rifle, and another handgun was on a desk. Lewis told Sanchez the marijuana was short and asked to swap it for another bag sitting on the table. Sanchez refused. Smith then walked in, visibly angry, followed by Thompson (although Lewis did not see either with a weapon). Perry, responding to Smith's aggressive manner, issued a gang challenge and announced he was a member of the Pueblo Bishop Bloods. Sanchez told everyone to "chill" and "be cool" and offered to ask the grow shop owner why the marijuana was short. Kincherlow walked in, and Sanchez told him to get control of his boys. Thompson asked why Perry and Sanchez had weapons and if they were being set up. Sanchez denied it was a

setup and said he could not reach the grow shop owner. He offered his M-15 rifle to Thompson to hold as collateral. Lewis left and assumed his fellow gang members left with him.

### 3. *Verdicts and Sentencing*

The jury found the defendants guilty on all counts and found true the special gang and firearm allegations except the allegation against Kincherlow on count 4 that a principal had personally used a firearm (§ 12022.53, subds. (b) & (e)(1)). Kincherlow and Smith admitted their prior convictions and prison terms in bifurcated proceedings.

The trial court sentenced Smith as a second strike offender to an indeterminate term of 14 years to life plus an aggregate determinate term of 42 years eight months. The sentence consisted of a life term, with the minimum term doubled (14 years to life), plus 10 years for the firearm enhancement for conspiracy to commit extortion, with consecutive terms of 10 years for robbery, plus 10 years for the firearm enhancement; four years for assault with a semiautomatic firearm, plus one year four months for the firearm enhancement; and 16 months for possession of a firearm by a felon; plus five years for the prior serious felony enhancement and one year for the prior prison term enhancement. The court imposed concurrent sentences of 17 years for assault with an assault weapon with enhancements plus 10 years for extortion with enhancements.

The trial court denied Kincherlow's *Romero* motion[7] to dismiss two of his three prior strikes because the offenses arose

_____

[7]     *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 529-531.

9

from a single act involving a single victim.[8] The court sentenced Kincherlow as a third strike offender to 25 years to life for robbery, plus 10 years for the gang enhancement and one year for the firearm enhancement; plus a consecutive term of 14 years to life as a second strike offender for conspiracy to commit extortion to benefit a criminal street gang; plus five years for the prior serious felony conviction (aggregating 55 years to life). The court imposed concurrent sentences of 22 years for assault with an assault weapon with enhancements, 24 years for assault with a semiautomatic weapon with enhancements, three years for possession of a firearm by a felon and life plus one year for extortion with enhancements.

The court imposed $240 in court operation assessments and $180 in court construction fees on each defendant and a restitution fine of $5,000.

## CONTENTIONS

Smith and Kincherlow challenge as insufficient the evidence supporting several of their convictions and contend the trial court's decision to replace a juror during deliberations was improper. In addition, they argue certain aspects of their sentences are improper, and Kincherlow contends the court abused its discretion by failing to dismiss two of his prior strike convictions under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*). Finally, Smith and Kincherlow contend the court erred by imposing assessments, fees and fines without first determining their ability to pay, as discussed in this court's

---

[8] The court also denied as untimely the prosecutor's effort to introduce an additional strike conviction from 2007.

decision in *People v. Dueñas* (2019) 30 Cal.App.5th 1157
(*Dueñas*).

## DISCUSSION

1. *Substantial Evidence Supports Kincherlow's Conviction for Robbery Under a Natural and Probable Consequences Theory*

The robbery charge was based on Smith's theft of Sanchez's gun.  Kincherlow argues he cannot be culpable for aiding and abetting Smith's crime because he tried to stop Smith from taking the gun and sought to defuse the tension created when Smith began threatening Sanchez and Perry.  Under the prosecutor's theory of the case, however, Kincherlow was guilty because the robbery was a natural and probable consequence of the conspiracy to extort Eco Recycling.  "'"Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design."'"
(*People v. Maciel* (2013) 57 Cal.4th 482, 515, citations omitted; see *People v. Guillen* (2014) 227 Cal.App.4th 934, 998 ["each member of a conspiracy is criminally responsible for the acts of fellow conspirators committed in furtherance of and which follow as a natural and probable consequence of, the conspiracy, even though such acts were not intended by the conspirators as part of their common unlawful design"].)

"[U]nder the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.'"  (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.)  "'The latter question is not whether the aider and abettor *actually* foresaw the

11

additional crime, but whether, judged objectively, it *was reasonably* foreseeable. [Citations.] Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'" (*People v. Medina* (2009) 46 Cal.4th 913, 920; accord, *People v. Robins* (2020) 44 Cal.App.5th 413, 422.) "'[T]o be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]' [Citation.] A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury." (*Medina,* at p. 920; *Robins*, at p. 422.) We review a jury's finding for substantial evidence.[9]

---

[9] In considering a claim of insufficient evidence in a criminal case, "'we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict— i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve

12

There is little question the jury could find the robbery of the gun was a reasonably foreseeable consequence of the conspiracy to extort Eco Recycling. Kincherlow and Lewis had forced Sanchez to give up more than $7,000 in cash only half an hour before Smith and Thompson entered the office armed and ready to take the additional money the gang members believed Sanchez owed them. Kincherlow may have harbored doubts about Smith's aggressive approach and seizure of the gun; but he, along with Lewis, had led the conspiracy to extort Eco Recycling, meeting repeatedly with the reluctant Sanchez and pushing him to pay up.[10] Kincherlow argues the jury's questions and requests for readback of testimony indicate their discomfort with finding him guilty of robbery. That is indeed the probable basis for the jury's finding of not true for Kincherlow on the related firearm-use allegation, but it bears no further weight.

---

neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict.'" (*People v. Penunuri* (2018) 5 Cal.5th 126, 142; accord, *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

[10] Kincherlow's citation to cases standing for the limited proposition that a defendant's mere presence at the scene of a crime is insufficient to sustain a conviction (see, e.g., *People v. Miranda* (2011) 192 Cal.App.4th 398, 407) is misleading. The court in *Miranda* similarly affirmed a defendant's conviction for aiding and abetting a robbery on precisely the same grounds as present here. (*Id.* at pp. 408-409.)

2. *Substantial Evidence Supports the Convictions for Assault with an Automatic Weapon*

Kincherlow and Smith each contend insufficient evidence supported their convictions for assault with an automatic weapon because the evidence failed to establish Thompson pointed the rifle at Sanchez or Perry or that the weapon was loaded and operational.

To prove a defendant committed assault with an assault weapon pursuant to section 245, subdivision (a)(3), the prosecution must establish the defendant willfully performed an act with such a firearm with the present ability to apply force with that firearm. (§§ 240, 245, subd. (a)(3); see *People v. Williams* (2001) 26 Cal.4th 779, 787.) It is enough for the defendant to have had "only a general criminal intent and not a specific intent to cause injury." (*Williams,* at p. 782; accord, *People v. Chance* (2008) 44 Cal.4th 1164, 1169.) "[A]ssault only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*Williams*, at p. 790.)

Certain purposeful acts have long been recognized as assaultive conduct because of their inherent danger to others: "'Holding up a fist in a menacing manner, drawing a sword, or bayonet, presenting a gun at a person who is within its range, have been held to constitute an assault.'" (*People v. Colantuono* (1994) 7 Cal.4th 206, 219, quoting *People v. McMakin* (1857) 8 Cal. 547, 548; see *People v. Rivera* (2019) 7 Cal.5th 306, 333 [intentional display of a firearm in a menacing manner may be enough to establish assault].) As *McMakin* explains, "The drawing of a weapon is generally evidence of an intention to use

14

it.  Though the drawing itself is evidence of the intent, yet that evidence may be rebutted when the act is accompanied with a declaration, or circumstances, showing no intention to use it.  But when the party draws the weapon, although he does not directly point it at the other, but holds it in such a position as enables him to use it before the other party could defend himself, at the same time declaring his determination to use it against the other, the jury are fully warranted in finding that such was his intention." (*McMakin*, at p. 549; accord, *People v. Chance*, *supra*, 44 Cal.4th at p. 1172 [assault does not require a direct attempt at violence, "'any indirect preparation towards it . . . such as drawing a sword or bayonet, or even laying one's hand upon his sword, would be sufficient'"]; see *People v. Raviart* (2001) 93 Cal.App.4th 258, 263 ["[a]ssault with a deadly weapon can be committed by pointing a gun at another person [citation], but it is not necessary to actually point the gun directly at the other person to commit the crime"].)

As to the operational capacity of the gun at the time of the offense, the Supreme Court has long allowed fact finders to infer a firearm is operational and loaded from the defendant's conduct. (See *People v. Rodriguez* (1999) 20 Cal.4th 1, 12-13 (*Rodriguez*).) In *Rodriguez* the Supreme Court overturned a court of appeal decision that had reversed an assault conviction for the prosecutor's failure to prove the firearm was loaded.  The Supreme Court reminded the appellate court it was obligated to review the record in the light most favorable to the judgment: "'"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'"

15

(*Id.* at p. 11.)  The Court declined to address the longtime rule that "an assault is not committed by a person's merely pointing an (unloaded) gun in a threatening manner at another person" (*id.* at p. 11, fn. 3), and instead focused on "the required quantum of circumstantial evidence necessary to demonstrate present ability to inflict injury and thus to sustain a conviction of assault with a firearm" (*ibid.*).  In the absence of direct evidence, the Court concluded, "A defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a loaded weapon."  (*Id.* at p. 13.) Because the defendant had pointed his gun in the face of the victim and threatened to kill him as he had another victim the preceding day, the Court affirmed the conviction, concluding it could not find the jury had been unreasonable.  (*Ibid.*)

Several courts have chafed at the *Rodriguez* Court's refusal to overrule the requirement of circumstantial evidence a firearm was operational (see, e.g., *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 542, fn. 10 [calling the rule an "anachronism" and urging the Supreme Court to reexamine it and discard it]; see also *People v. Miceli* (2002) 104 Cal.App.4th 256, 269 [citing *Lochtefeld*]), but the Supreme Court has declined to do so. (See *People v. Penunuri* (2018) 5 Cal.5th 126, 147 [acknowledging the traditional rule, but following *Rodriguez*:  "[T]he fact that the gun was loaded may be inferred from circumstantial evidence, and we will uphold an assault conviction if the inference is reasonable"].)

In this case the evidence showed that Thompson followed Smith into the Eco Recycling office, walking in a stiff-legged manner, shortly after Lewis and Kincherlow had taken $7,000 from Sanchez.  Thompson withdrew the assault rifle from his

16

pant leg and held it pointing at the floor while blocking the door, preventing Sanchez and Perry from leaving. Smith, who was also armed, threatened Sanchez and Perry, by stating he and his gang members could just kill them unless they produced additional cash. Sanchez and Perry each testified he was frightened by the weapons and did not move when Smith opened the drawer and removed Sanchez's gun. Although there is no testimony Thompson pointed the assault rifle at Sanchez or Perry, there was ample evidence from which the jury could reasonably conclude Thompson was prepared to use the rifle immediately if necessary and it was fully operational. Under these circumstances we may not second-guess the jury's conclusion Smith and Kincherlow were guilty of assault with an automatic weapon.

3. *Substantial Evidence Supports Kincherlow's Conviction for Possession of a Firearm by a Felon*

Section 29800, subdivision (a)(1), states, "Any person who has been convicted of . . . a felony . . . and who owns, purchases, receives, or has in possession or under custody or control any firearm is guilty of a felony." The elements of this offense are conviction of a felony and ownership or knowing possession, custody or control of a firearm. (*People v. Blakely* (2014) 225 Cal.App.4th 1042, 1052; *People v. Snyder* (1982) 32 Cal.3d 590, 592 [former § 12021, subd. (a)(1)].) Possession may be actual or constructive. "'A defendant has actual possession when the weapon is in his [or her] immediate possession or control,'" that is, when he or she is actually holding or touching it. (*Blakely*, at p. 1052; see *People v. Montero* (2007) 155 Cal.App.4th 1170, 1179.) "To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the

17

prohibited item, either directly or through another person." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, disapproved on another ground in *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.) "A firearm can be under a person's dominion and control without it being available for use." (*Blakely*, at p. 1052.)

Kincherlow does not dispute he lived in the apartment adjoining the carport where the .44 caliber handgun was found but contends there was no direct evidence linking him to the weapon. He asserts his teenage stepson also had access to the unsecured locker. However, joint dominion or control is sufficient to establish the crime (*People v. Miranda* (2011) 192 Cal.App.4th 398, 410), and "constructive possession can be established by circumstantial evidence and the reasonable inferences drawn therefrom" (*id.* at p. 411). The weapon recovered from the locker had previously been reported as stolen, a fact that aligns with Grant's testimony she sold Kincherlow a stainless steel .44 caliber handgun she had stolen in a burglary. The fact the backpack contained the same brand of condoms as found in Kincherlow's wallet when he was arrested further supports the inference Kincherlow had exercised control over the weapon. In short, the jury had sufficient evidence to conclude he was in possession of the firearm.

4. *The Trial Court Did Not Abuse Its Discretion by Discharging Juror No. 5*

a. *The jurors' complaints and the removal of Juror No. 5*

On the second day of deliberations the presiding juror sent a note complaining that Juror No. 5 was allowing past experiences to affect his decisions and did not seem to know the facts presented at trial. The court informed counsel of the note and indicated its intention to question the presiding juror and, possibly, other jurors.

18

The presiding juror, Juror No. 6, advised the court that Juror No. 5 had discussed an experience with a police officer and indicated his belief police officers are not always truthful. Juror No. 6 also stated Juror No. 5 had not paid attention to the evidence, was not familiar with it and appeared confused. When the court explained it was not concerned with whether Juror No. 5 believed or disbelieved witnesses, Juror No. 6 stated Juror No. 5 was not considering the evidence. The court determined no additional inquiry was needed.

The following day, the presiding juror sent a second note: "Multiple jurors have concerns about Juror [No. 5]. We have noticed he is not focused on the case. He has been observed not following the case, falling asleep. He did not know which defendant or attorney is which. He told us he had [a] son that was an officer but later denied stating it. He also asked if we saw guns on the videos. . . . He does not know what he is voting for."

The court informed counsel it would again speak to the presiding juror, as well as the other jurors who were having concerns about Juror No. 5. The court also noted it had called a recess during closing arguments because Juror No. 5 appeared to be falling asleep.

Juror No. 6 told the court Juror No. 3 had written the note. Juror No. 6 expressed her own concerns that Juror No. 5 was falling asleep during deliberations and was not paying attention to the videos. He also told irrelevant, rambling stories and had admitted he did not understand what issues jurors were voting on. She added that Juror Nos. 2, 4 and 11 also had issues with Juror No. 5. Juror No. 3, a nurse, repeated the same concerns about Juror No. 5: He was not paying attention, did not know which defendant was which or who the attorneys were she stated, "We may be discussing something and he'll ask us, 'What?' And we have to repeat

19

everything again. I feel like I am personally explaining things to him child-like. And he seems to be falling asleep." She speculated he was suffering from dementia and confirmed he had denied having a son who was a police officer after saying he did.

Juror Nos. 2, 4 and 11 confirmed the views of Juror Nos. 3 and 6, noting their frustration when, after falling asleep, Juror No. 5 would wake up and ask what had happened, forcing them to start over. They also confirmed he did not know who was who, had denied seeing guns in the video and had stated his son was a police officer, only to deny it later. Finally, the court spoke with Juror No. 5. When asked if he had been falling asleep during deliberations, he said, "You know, you fall asleep and you don't know it," but claimed he could still hear what was being said. He denied telling the other jurors his son was a police officer.

The court then heard argument from counsel. Kincherlow's attorney argued Juror No. 5 had been deliberating but the other jurors did not like his viewpoint. He, therefore, could not be removed under section 1089. Smith's attorney concurred, pointing out being "slow or forgetful" was not a ground for dismissal and these were simply normal problems in deliberation. The court disagreed and removed Juror No. 5. The court based its decision on Juror No. 5's inconsistent statements about his son, his admission of sleeping during trial and deliberations and his failure to pay attention and participate in deliberations.

b. *Governing law*

Section 1089 provides, in part, "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her duty, or if a juror requests a discharge and good cause appears therefor, the court

20

may order the juror to be discharged . . . ." Kincherlow and Smith challenge the trial court's discharge of Juror No. 5 as improper, asserting other jurors complained about Juror No. 5 because they disagreed with his views, not because he had failed to perform his duty as a juror.

"When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051.) "'[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations. The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations. Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.'" (*Id.* at p. 1054; see also *People v. Nelson* (2016) 1 Cal.5th 513, 569 ["a trial court may intervene in jury deliberations where it receives reports of juror misconduct or in response to an impasse, but such interventions must be limited and undertaken with the utmost respect for the sanctity of the deliberative process"].)

A trial court's decision to discharge a juror under section 1089 is reviewed for abuse of discretion. (*People v. Armstrong* (2016) 1 Cal.5th 432, 450.) However, in reviewing the record we apply the more stringent "demonstrable reality standard" of review rather than the more deferential substantial evidence standard. (*Armstrong*, at p. 451.) This "'heightened standard . . . more fully reflects an appellate court's obligation to

21

protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury.'" (*Id.* at p. 450, quoting *People v. Barnwell*, *supra*, 41 Cal.4th at p. 1052.)

### c. *The court properly removed Juror No. 5*

The record supports the trial court's decision to discharge Juror No. 5. This is not a case like *People v. Bowers* (2001) 87 Cal.App.4th 722, at pages 730-731, in which the reviewing court reversed on the ground the isolated accusation of sleeping occurred after the juror in question had made known his disagreement with the view of the evidence shared by the remaining jurors. The court here emphasized to the presiding juror it was not interested in Juror No. 5's perception of witnesses or position on any particular issue; rather, the court limited its inquiry to Juror No. 5's conduct, which included sleeping and failing to track issues discussed in deliberations. In addition, the court did not rely only on the presiding juror; the court also questioned Juror Nos. 2, 3 (the author of the second note), 4 and 11, all of whom confirmed instances of Juror No. 5's falling asleep and his inability to focus or deliberate constructively, as well as his misstatements of fact. While the Supreme Court has not hesitated to reverse when a trial court fails to meet the demanding standard of "demonstrable reality" (see, e.g., *People v. Armstrong, supra,* 1 Cal.5th at pp. 451-454 [trial court relied on only two jurors who had stated challenged juror was refusing to deliberate; evidence showed limited instances and failed to account for juror's differing view of evidence]; *People v. Cleveland* (2001) 25 Cal.4th 466, 485-486 [trial court abused its discretion by discharging juror whose view of the evidence differed from that of other jurors; record failed to establish demonstrable reality that juror had refused to

22

deliberate]), it has found ample cause for discharge when a juror is seen sleeping from time to time during deliberations or trial. (See *People v. Williams* (2015) 61 Cal.4th 1244, 1277-1278 [affirming discharge where six jurors described seeing challenged juror sleeping during deliberations]; *People v. Bonilla* (2007) 41 Cal.4th 313, 350 [sleeping during trial constitutes good cause for dismissal of a juror]; *People v. Ramirez* (2006) 39 Cal.4th 398, 456-457 [affirming discharge of juror for sleeping]; *People v. Johnson* (1993) 6 Cal.4th 1, 21-22 [affirming trial court's excusal of juror for sleeping corroborated by "[t]he court, its two deputies, and the prosecutor"].)

5. *The Trial Court Abused Its Discretion in Refusing To Dismiss One of Kincherlow's Prior Strikes*

Section 1385, subdivision (a), vests the court with discretion to dismiss a qualifying strike conviction "in furtherance of justice." (*Romero, supra,* 13 Cal.4th at p. 530; *People v. Williams* (1998) 17 Cal.4th 148, 158.) "[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law . . . or in reviewing such a ruling, the court . . . must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the [three strikes] scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*Williams*, at p. 161.) We review the trial court's decision not to dismiss a prior strike allegation under section 1385 for abuse of discretion. (*In re Large* (2007) 41 Cal.4th 538, 550.) "'"[T]he burden is on the party attacking

the sentence to clearly show that the sentencing decision was irrational or arbitrary."'" (*People v. Carmony* (2004) 33 Cal.4th 367, 376.)

Notwithstanding a court's broad discretion, in rare circumstances the dismissal of one or more prior strike convictions may be required when the convictions arose from the same act. (See *People v. Vargas* (2014) 59 Cal.4th 635, 640 (*Vargas*).) In *Vargas* the defendant had been convicted of carjacking and robbery growing out of a single act in which she took the victim's car by force. Years later, she was convicted of several felonies arising from a burglary. When sentenced, it was alleged that her carjacking and robbery convictions were separate strikes within the meaning of the Three Strikes law. The trial court denied her motion to dismiss the carjacking strike. The Supreme Court reversed, holding, in the unusual circumstance presented when a defendant's single act committed against a single victim gives rise to multiple felony convictions, only one of those convictions may be treated as a strike in later criminal proceedings. (*Id.* at p. 647.)

Relying on *Vargas*, Kincherlow contends the trial court abused its discretion when it denied his motion to dismiss two of what were counted as three strikes arising from a single act against a single person. Kincherlow was convicted in 1991 of attempted robbery, attempted murder and mayhem after he pointed a gun at a driver waiting in a drive-through line at a fast-food restaurant, demanded the driver give up his wallet and car and then immediately shot the driver in the face. The victim survived but was blinded by the gunshot. (See *People v. Kincherlow* (Oct. 4, 1994, B075489) [nonpub. opn.] at p. 3.) The trial court sentenced Kincherlow, who was 17 years old when the

24

crimes were committed, to a state prison term of 14 years for attempted murder and stayed his sentences on the other two convictions under section 654 because all three crimes arose from a single course of action. (*Id.* at pp. 18-19.)[11]

The trial court here abused its discretion in declining to dismiss Kincherlow's prior strike conviction for mayhem. Mayhem results when a person "unlawfully and maliciously deprives a human being of a member of his own body, or . . . disfigures . . . or disables the tongue, or puts out an eye . . . ." A single gunshot resulted in Kincherlow's convictions for both attempted murder and mayhem. Under *Vargas*, therefore, the trial court should have dismissed that strike.

Kincherlow's attempted robbery conviction, however, does not fall within the scope of *Vargas*. Although a 17-year-old youth who demands a victim relinquish his car and immediately shoots him in the face could be viewed as having panicked during the single act of carjacking, the Supreme Court has viewed this exact sequence as two separate acts falling outside the limited scope of *Vargas*. As the *Vargas* Court acknowledged, it had previously held "'the electorate and the Legislature rationally could—and did—conclude that a person who committed additional violence in the course of a prior serious felony (e.g., shooting or pistol-whipping a victim during a robbery, or assaulting a victim during a burglary) should be treated more harshly than an individual

---

[11]    Section 654 "expressly prohibits separate punishment for two crimes based on the same act but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*Vargas*, *supra*, 59 Cal.4th at p. 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.)

25

who committed the same initial felony, but whose criminal conduct did not include such additional violence.'" (*Vargas*, *supra*, 59 Cal.4th at p. 646, quoting *People v. Benson* (1998) 18 Cal.4th 24, 35.)  Accordingly, the trial court here did not abuse its discretion in declining to dismiss the attempted robbery strike, and Kincherlow remains a third strike offender.

### 6.  *Smith's and Kincherlow's Sentences Require Correction*

#### a.  *The sentence for extortion (count 17) must be stayed pursuant to section 654*

As discussed, California law generally prohibits a single criminal act from being punished more than once.  As applicable here, under section 654 a defendant may not be punished for both the conspiracy to commit a crime and the underlying crime when the conspiracy had no objective apart from the underlying crime. (*People v. Dalton* (2019) 7 Cal.5th 166, 247, citing *People v. Lewis* (2008) 43 Cal.4th 415, 539; *People v. Beman* (2019) 32 Cal.App.5th 442, 446-447; *People v. Vargas* (2001) 91 Cal.App.4th 506, 570-571.)

Smith and Kincherlow were each convicted of conspiracy to commit extortion (count 1), as well as the underlying crime of extortion (count 17).  The overt acts charged in the conspiracy count were identical to the objective of the underlying crime:  As the prosecutor argued, "[T]he conspiracy is the plan; the extortion is the actual taking of the money.  Here, we have both."  The trial court ordered the sentences for count 17 to run concurrently to those on count 1; but, as the Attorney General concedes, those

sentences, including any enhancements, should have been stayed under section 654.[12]

       b. *Kincherlow's concurrent sentence for assault with a semiautomatic weapon (count 7) should have been 14 years rather than 24 years*

Kincherlow contends, and the Attorney General concedes, the enhancements for his concurrent sentence for assault with a semiautomatic firearm were misapplied. Kincherlow was sentenced to the upper term of nine years, to which the court added 10 years for the true finding on the gang enhancement and five years for the prior serious felony enhancement under section 667, subdivision (a), for a total of 24 years. The prior

---

[12] An additional sentencing issue related to these counts may require consideration on remand. The Supreme Court recently granted review in *People v. Lopez* (2020) 46 Cal.App.5th 505, review granted July 15, 2020, S261747. The court of appeal in that case had held "a conspiracy conviction . . . may be subject to the alternate penalty provision of section 186.22, subdivision (b)(4)(B), which imposes a prison term of 15 years to life for certain gang-related crimes." (*Lopez*, at p. 510.) The Supreme Court granted review limited to the following question: "Did the trial court err by sentencing defendant to 15 years to life under the alternate penalty provision of the criminal street gang penalty statute (Pen. Code, § 186.22, subd. (b)(4)(B)) for his conviction of conspiracy to commit home invasion robbery, even though conspiracy is not an offense listed in the penalty provision?" Because Smith and Kincherlow were sentenced for conspiracy to commit extortion (count 1) to an indeterminate term of life with a minimum term of seven years under the alternative penalty provision of section 186.22, subdivision (b)(4)(C), the decision by the Supreme Court may affect that portion of their sentences.

serious felony enhancement should not have been applied to both this count and to count 6 (assault with an assault weapon), since determinate terms were imposed for each aggravated assault. (See *People v. Sasser* (2015) 61 Cal.4th 1, 7; accord, *People v. Tua* (2018) 18 Cal.App.5th 1136, 1141.)  As for the gang enhancement, the court imposed 10 years under section 186.22, subdivision (b)(1)(C), when it should have imposed the five-year enhancement under subdivision (b)(1)(B), as this crime is a serious felony, not a violent one.  The proper concurrent term, therefore, is nine years for the aggravated assault, plus five years for the gang enhancement, for a total of 14 years.

      c.  *The trial court erred by imposing the 10-year gang enhancement on Kincherlow for robbery (count 4) instead of the 15-year mandatory minimum for third strike offenders*

The trial court sentenced Kincherlow to 41 years to life for robbery, consisting of a third strike sentence of 25 years to life, plus 10 years for the gang enhancement, five years for the section 667, subdivision (a), prior serious felony enhancement and one year for the section 12022 firearm enhancement. Kincherlow contends the court erred by imposing a 10-year term for the gang enhancement instead of the minimum parole eligibility term of 15 years.  The Attorney General concedes he is correct.

"[S]ection 186.22, subdivision (b)(5) . . . provides that a defendant who commits 'a felony punishable by imprisonment in the state prison for life' for the benefit of a criminal street gang 'shall not be paroled until a minimum of 15 calendar years have been served.'" (*People v. Montes* (2003) 31 Cal.4th 350, 352; see *People v. Lopez* (2005) 34 Cal.4th 1002, 1004 [where a

defendant is convicted of a violent felony punishable by life imprisonment, "section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the defendant may be considered for parole"]; *People v. Williams* (2014) 227 Cal.App.4th 733, 736 ["[s]ection 186.22, subdivision (b)(5) provides that the 15-year minimum parole eligibility requirement should be imposed instead of the [criminal street gang] sentence enhancement . . . if the defendant is convicted 'of a felony punishable by imprisonment in the state prison for life'"].) "'This provision establishes a 15-year minimum parole eligibility period, rather than a sentence enhancement for a particular term of years.'" (*Williams*, at p. 740.) "Thus, the predicate for application of section 186.22, subdivision (b)(5)'s exception to the imposition of a consecutive term for the gang enhancement is that the defendant has been convicted of a felony punishable by life imprisonment." (*Williams,* at p. 740; see *Lopez*, at p. 1004 ["[s]ection 186.22(b)(1)(C) does not apply . . . where the violent felony is 'punishable by imprisonment in the state prison for life,'" and "[i]nstead, section 186.22, subdivision (b)(5) . . . applies and imposes a minimum term of 15 years before the defendant may be considered for parole"]; *People v. Fiu* (2008) 165 Cal.App.4th 360, 390 ["[i]f the parole limitation of subdivision (b)(5) is applicable, the 10-year enhancement is not"].)

> d. *The one-year enhancements imposed pursuant to section 667.5, subdivision (b), must be stricken*

Former section 667.5, subdivision (b), in effect at the time of sentencing, provided for an enhancement of one year for each prior separate prison term served for "any felony." Pursuant to this section, the trial court imposed an additional one-year term

on Smith and imposed and stayed three additional years on Kincherlow.[13]

Effective January 2, 2020, however, the Legislature amended the statute to specify that only sexually violent offenses are subject to this enhancement.  (§ 667.5, subd. (b), as amended by Stats. 2019, ch. 590, § 1.)  The Attorney General concedes this amendment is retroactive.  (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306-308; *In re Estrada* (1965) 63 Cal.2d 740.)  Accordingly, we strike the one-year prior prison term enhancements imposed on Smith and Kincherlow pursuant to section 667.5, subdivision (b), and remand their cases for resentencing.  (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"]; *People v. Bell* (2020) 48 Cal.App.5th 1, 24 [upon appellate court's striking of a section 667.5, subdivision (b), prior prison term enhancement, "the trial court is entitled to reconsider appellant's entire sentence"].)

---

[13]    The trial court improperly imposed and stayed the three one-year prior prison sentence enhancements on Kincherlow pursuant to section 667.5, subdivision (b).  "Once the prior prison term is found true within the meaning of section 667.5(b), the trial court may not stay the one-year enhancement, which is mandatory if not stricken." (*People v. Langston* (2004) 33 Cal.4th 1237, 1241; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1020.)  Had the section not been amended, we would have remanded this issue to the trial court to determine whether to impose or strike the enhancements.

### e. *Remand for Resentencing Is Also Necessary Pursuant to Section 667, Subdivision (a)*

Smith and Kincherlow contend, and the Attorney General concedes, remand is also appropriate for the trial court to exercise its discretion whether to strike the prior serious felony conviction enhancements imposed pursuant to section 667, subdivision (a).

In 2018 the Governor signed into law Senate Bill No. 1393 (2017-2018 Reg. Sess.), which went into effect on January 1, 2019. (See Stats. 2018, ch. 1013, §§ 1, 2.) Senate Bill No. 1393 amended section 1385 by deleting subdivision (b), which prohibited trial courts from exercising discretion "to strike any prior conviction of a serious felony for purposes of enhancement of a sentence under [s]ection 667." (Former § 1385, subd. (b).) Senate Bill No. 1393 applies retroactively to Smith and Kincherlow because their sentences were not final at the time the new law became effective on January 1, 2019. (*People v. Jones* (2019) 32 Cal.App.5th 267, 272 [Sen. Bill No. 1393 applies retroactively]; *People v. Garcia* (2018) 28 Cal.App.5th 961, 973 [same]; see *In re Estrada, supra,* 63 Cal.2d at pp. 744-745 [absent contrary legislative intent, "[i]f the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies"].) Accordingly, on remand the trial court should exercise its discretion as to imposition of the section 667, subdivision (a), prior serious felony conviction enhancements.

### 7. *Smith and Kincherlow Will Have an Opportunity To Request an Ability-to-pay Hearing on Remand*

As part of their sentences the trial court imposed on each defendant $240 in court operation assessments, $180 in court construction fees and restitution fines of $5,000. Relying on this court's decision in *Dueñas, supra,* 30 Cal.App.5th 1157, which required ability-to-pay hearings as a matter of due process, Smith and Kincherlow argue remand is required to permit them to establish their inability to pay those assessments, fees and fines. Because they had a right to raise an ability-to-pay objection in connection with imposition of a restitution fine greater than the $300 statutory minimum (see § 1202.4, subds. (c) [court may increase restitution fine beyond $300 statutory minimum], (d) [defendant bears burden of demonstrating his or her inability to pay restitution fine in excess of statutory minimum]), but failed to so, the Attorney General contends Smith and Kincherlow forfeited any *Dueñas* argument. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 [defendant forfeited challenge to assessments and fines because he "did not object in the trial court on the grounds that he was unable to pay, even though the trial court ordered him to pay the $10,000 statutory maximum restitution fine"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["[a]s a practical matter, if [the defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"]; but see *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant did not forfeit *Dueñas* challenge to court operations and facilities assessments, even though he did not object to the maximum $10,000 restitution fine, because the "defendant's inability to pay is just one among many

32

factors the court should consider in setting the restitution fine above the minimum"].)

Although we have previously declined to apply a general rule of forfeiture in cases in which sentencing occurred before the decision in *Dueñas* because it announced a constitutional principle that could not have been reasonably anticipated (see *People v. Castellano* (2019) 33 Cal.App.5th 485, 489), under the circumstances present here we might be inclined to agree with the Attorney General. However, because we must remand the case for resentencing in any event, Smith and Kincherlow will have the opportunity to request a hearing concerning their ability to pay fines, fees and assessments.

## DISPOSITION

The convictions are affirmed. We vacate Smith's and Kincherlow's sentences and remand the cases for resentencing with directions for the trial court to correct the various errors identified in this opinion; to exercise its discretion whether to impose the sentence enhancements for Smith's and Kincherlow's prior serious felony convictions pursuant to section 667, subdivision (a); to consider, if requested, Smith's and Kincherlow's ability to pay fines, fees and assessments; and to conduct such other sentencing matters consistent with this opinion.

PERLUSS, P. J.

We concur:

SEGAL, J.                    FEUER, J.